Our first case is United States v. Gilberto Vizcarra-Millan. Richard Bernard Grundy III, Derek Atwater, Giselle Neville, Andre Mosby, and James Beasley. Appeal numbers 19-3476 and following. We'll be hearing first from Mr. Henderson, as I understand it, on behalf of Mr. Vizcarra-Millan. Mr. Henderson, go ahead. Thank you, Your Honor. May it please the Court. I'm Peter Henderson. I represent Mr. Vizcarra-Millan. I'd like to focus on what happened in May and June of 2019 when Mr. Vizcarra-Millan re-invoked his right to conflict-free counsel. The district court applied the wrong legal standard to deny that motion. It imported a standard from Rule 11, which concerns guilty pleas and the finality that attaches to guilty pleas. The requirement of the Sixth Amendment that a defendant be afforded effective assistance of counsel is a continuing obligation, and a defendant's initial choice to waive that right is not cast in stone. I think the government agrees with that. Certainly, the circuit courts agree with that. What the Second Circuit said for example is that it would be manifestly improper for a court to deny a re-invocation of the right simply because before the defendant had made a knowing and voluntary decision to waive it. That was the singular focus of the district court. It did not engage in the sort of weighing of interest that's required by Wheat v. United States, that's required by Rule 44. Instead, it was singularly focused on do you waive the right in February 2019, and then was your waiver knowing and voluntary in May and June. Aren't you also arguing, Mr. Henderson, that the district court, I thought your principal argument was the district court erred by not disqualifying Mr. Tennyson in February? That is a principal argument. I think there are two principal arguments. Of course, that's reviewed for an abuse of discretion. We think the district court did abuse its discretion. The red flags that you could see in February manifested themselves in what happened in May, where the district court had before it an unethical lawyer and an equivocating defender. When it asked the defendant, do you really want to go through with this, you didn't sign a waiver, even though you told Judge Parker you would. Mr. Vizcarra-Millan said, I don't know. I've given all my money to this person. I feel like maybe he's not the best thing for me. The response to that was, well, I don't care about the money. Do you waive? He said, well, I mean, I think I ought to, but I don't know. The court said, well, talk to your conflicted lawyer. After a recess in which Mr. Tennyson talked to Mr. Vizcarra-Millan, he said, okay, I'll waive. That is not the sort of waiver that under Wheat v. United States should be accepted. The waiver, of course, is a necessary- An equivocating defendant poses the worst problem for a district judge, right? Because I have no doubt that if Judge Stinson had done what you're saying she should have in February or in May and had disqualified Tennyson, we'd be seeing an argument from Vizcarra about his right to counsel. If Tennyson had been disqualified in May, his new lawyer didn't have enough time to prepare, right? I think you'd see that argument. I think that you would affirm, though, that the cases that the government cites involve this court affirming because of Wheat v. United States. Under Wheat v. United States, the district court has broad discretion to say, I understand you're waiving this conflict, but given all of the circumstances here, the independent interest that the court has in ensuring that the legal proceedings are fair and appear fair outweighs your interest in retaining counsel of choice. We should remember that counsel of choice is not as strong a right, you should say, you could say, as the basic Sixth Amendment right to the effective representation of counsel. And so I think you would see that argument. I don't think it would succeed. The other thing that happened in May, too, the big problem I have is the district court never involved Mr. Vizcarra-Millan in any discussion of what was going on. I think it would have been entirely proper for the district court to actually bring him into court instead of just talking to the lawyer, say, look, I'm in a difficult situation. You're re-invoking your rights six weeks before trial. You have the right to the effective assistance of counsel, but it's going to be tight. Your lawyer is not going to have a lot of time to prepare if I appoint new counsel. You can, of course, represent yourself, or you can continue with conflicted counsel. Let him make the choice. But the choice should belong to him, not to the court. And I see I'm out of time, so I'll save the rest of my time. Does anybody else have any other questions for Mr. Henderson at this point? No. If not, then we'll proceed to hear Mr. Carlson for Mr. Grundy. Can you unmute yourself, Mr. Carlson? May it please the court, my name is Kent Carlson, and I represent Richard Grundy. As I was preparing for this oral argument, I was kind of intrigued by the government's argument in their brief that while I had asserted that the district court proposed improper conditions on Mr. Grundy's exercise of his constitutional right to represent himself, that I had never spelled out why the conditions were improper. And as I thought about it a little bit, I guess my answer was, it was to me just simple and obvious that the proposed conditions were just plain unfair. They had the effect of telling Mr. Grundy that if he exercised his constitutional right to represent himself, he could have standby counsel, but he would not have ready access to standby counsel at trial, or more importantly, standby counsel's computer, which contained all of the discovery and trial exhibits in the case. And as I thought about it a little bit more, I thought about it as a trial lawyer, and I thought, what if a witness got up and said the sky is blue at trial? But in one of his many interviews, he said the sky was black. What do we do, however, Mr. Carlson? I think we can all understand that's a difficult constraint, but what do we do with Mr. Grundy's history in this case, violating orders restricting his access? We have the story of the later jury that had to be discharged because information about them had been disclosed. It's a pretty tough problem. I would agree with the court that it is a tough problem, but I think that the conditions that the example, I will order that a written copy of the discovery be available at counsel table, not to leave counsel table for Mr. Grundy's use during the trial. Did anybody propose that? It was not proposed, Judge. That would be one solution. Another would be under the Criminal Justice Act, the court could have appointed an assistant to manage the discovery. Did anybody propose that? It was not proposed, Judge. The only conditions that were imposed were the ones that were initially brought out by the judge and then echoed again when the judge enlisted the United States Attorney's input as to what conditions should be imposed on Mr. Grundy's rights. What's wrong with that question, given Mr. Grundy's track record here? Judge, what is wrong with that, in my opinion, is that what the colloquy was under the case law supposed to be was a mutual give and take and not a confrontational interrogation. That's what it turned into. It was designed clearly to convince Mr. Grundy that under no circumstances was the court going to allow him to represent himself because he couldn't under the conditions the judge imposed. No one could represent somebody under those conditions. It was clear that that's what the court was trying to do. It was even made more clear after Mr. Grundy surrendered his attempts to represent himself when the district court said to Mr. Grundy, well, now that you've given up your right to represent yourself, you can have what you really want, which is access to standby counsel and counsel and counsel's computer with the discovery and the exhibits, which you couldn't have had if you wanted to represent yourself. In my opinion, quite honestly, that was just an improper attempt to get Mr. Grundy to accept something that he did not want, which was to be represented by Mr. Riggins. He wanted to represent himself. He clearly exercised and knowingly and intelligently waived his right to counsel. And I think at that point, once he did that, judge, it should have been honored. The court should have allowed Mr. Grundy to represent himself. Mr. Carlson, your brief seems to treat his invocation of his Faretta right as if it's a Miranda kind of right. I want a lawyer, all questioning has to cease. It's just not the way this works, right? I mean, federal judges actually are trained to carry out persuasive Faretta colloquies to try to talk people out of it to see if they really understand what they're getting into. And I agree with your honor, but I would suggest that there's a difference between coercive and persuasive. And this was definitely coercive in my opinion. I see I'm out of time. All right. Thank you very much, Mr. Carlson. Next, we'll hear from Mr. Moody on behalf of Mr. Atwater. It is your honor. Yes. Hey, please. The court, Josh Mowdy from Cameron and Mowdy representing Derek Atwater. I would like to focus our discussion today on our argument that Derek Atwater was not a member of a drug dealing conspiracy, but merely a buyer and seller of drugs. Now, this court has acknowledged that drug conspiracies are unique and that convictions of being part of a drug conspiracy will be overturned if it's equally plausible that it was a buyer and seller relationship. We think that is the case with Derek Atwater. The government argues that Atwater was a member of a drug conspiracy primarily or partly because there was a mutual understanding of redistribution between Derek Atwater and David Carroll, that David Carroll knew Derek Atwater was reselling the drugs and that part of that understanding came from the fact that Derek Atwater asked for drugs to be packaged in smaller amounts. We contend that that would be true in a buyer seller relationship, much like a wholesaler selling to a retailer. The thrust of the government's argument at trial was that Derek Atwater was a member of this conspiracy because of the number of drug transactions between him and David Carroll. The fact that drugs were fronted and that the amounts of drugs purchased were more than what is considered common usage amount. And if this court accepts as true that Derek Atwater was buying drugs from David Carroll two times a week and that the amounts of drugs being purchased were not indicative of personal use, we still believe that it is plausible to consider this a buyer seller relationship. Again, a sale by a wholesaler to a retailer is consistent with an arm's length relationship rather than being proof of a conspiracy to parties. David Carroll. Can I ask you to address the government's evidence that at least sometimes in this long-term relationship, Carroll said that he was fronting drugs to Atwater? Yes, your honor. David Carroll testified that at less than half of his interactions with Mr. Atwater, he fronted drugs. I believe that was on the 29th of July, page 189. However, he did not testify, your honor, that any of the specific transactions discussed at trial were fronted transactions. And I argue that it's that lack of specificity that makes that evidence vague and incomplete and therefore does not rise to the level of a conspirator in a drug distribution operation. Derek Atwater, however, did warn David Carroll of police presence one time. However, there was no agreement. And I believe that it... Frankly, the one warning doesn't give me much pause, but the half or nearly half of the time fronting, that usually tends to carry a fair amount of weight, at least in permitting a jury to find a conspiracy. But your response is that that was too vague? Well, the fact that there was no... The government questioned Mr. Carroll at length about certain transactions and his interpretations of text messages and phone calls, but never once was there testimony that those particular deals were actually fronted deals. And also, David Carroll did testify that his relationship with Mr. Atwater began as a marijuana relationship. Thank you. So as this court has held in the past, a co-conspirator has to have skin in the game. There must be a joint criminal objective that goes beyond being a buyer and seller of drugs, and we do not think that has been proven in regard to Derek Atwater. Okay. Thank you very much, Mr. Mowdy. We'll next hear from Mr. Brodnick on behalf of Mr. Neville. May it please the court, your honors. My name is Tom Brodnick, and I am here today on behalf of Ezell Neville. One thing I am not going to argue today, your honors, is that Mr. Neville was the proverbial choir boy. He did not appeal the substantive distribution counts, and those counts that he was convicted on stand here today. We challenge only the two conspiracy counts that he was convicted of as well. We recognize that generally, under the law of conspiracy, that an insufficiency argument creates a high bar for the defendant. But as this court has stated, the height of that bar directly depends on the strength of the government's case. And in neither the narcotics nor the money laundering conspiracy do we believe that the With regard to the narcotics conspiracy specifically, I want to concentrate today simply on the testimony of Emilio Mitchell II's testimony. He was a cooperating co-defendant. In my opinion, he provides, if you will, the two most damning allegations of conspiracy as of Mr. Neville. He testified that he planted meth to Mr. Neville maybe two or three times when Richard Grundy was out. And he states that he was in Phoenix with Viscar Milan buying marijuana when Mr. Neville was stopped in Albuquerque in January of 2017 with cocaine. And he alleges that Mr. Viscar Milan told him the cocaine was for Grundy. Now, even accepting the testimony with regard to the planting, the testimony was that that occurred maybe, quote, maybe two or three times. And that was only when Richard Grundy was out of methamphetamine. Occasional credit sales, Your Honor, are insufficient to put, are insufficient evidence to put him within the conspiracy. Further, most of the cases that discuss the issue of fronting, there is always some other indicia of conspiracy along with that fronting. For example, in the long case, there was favorable pricing in discussions about expanding the business. There was none of that here. Mr. Neville did not receive any type of favorable pricing from Mr. Mitchell. In the Moreno case, there were warnings to law enforcement and the sharing of tools of the trade in the evidence of cars with hollowed out spaces for placing of drugs. And finally, Your Honor, I'd like to say that the testimony here is also equivocal. Just like it was in the Pulver case, he was there maybe two or three times. As for the testimony about Neville being stopped in Albuquerque with cocaine, I'd like to focus a little bit on what's not in the record as opposed to what's in the record. The government extracted phone data from numerous phones, including Neville and Mitchell. I was sent through three days of trial while the government painstakingly did pings and text messages and watched people fly back and forth and drive in buses across the country. Government introduced reams of that data, but not with regard to Mr. Mitchell being in Phoenix on that day. In fact, the evidence was that Mr. Mitchell's son was in Phoenix on that day. One more point with regard to Mr. Mitchell, he testified that he was at Viscar Milan's residence on August 1st, 2017, buying marijuana when the $84,000 was interdicted in Albuquerque. He also testified that it was only after that date that he saw methamphetamine at Viscar Milan's residence. He indicated that Viscar Milan asked him if he wanted meth, and he said no because he had no customers. However, he also testified that he contributed $6,000 of that $84,000 that was interdicted to buy meth. Now, that makes absolutely no sense, and I'm not asking the court here to reweigh the evidence or to make a credibility determination. This is evidence not that the jury has to choose between two witnesses and favoring one over the other. This is contradictory and vague testimony coming from a single witness, and I think that's the type of evidence the court can consider in determining whether substantial evidence puts Mr. Neville in conspiracy. With regard to the money laundering, Your Honor, there was a meeting on August 1st, and the government proved that, but Mr. Carroll indicates he thinks Mr. Neville was at that apartment. Officers had staked out that apartment. There was no testimony that Mr. Neville was there, and no one testified he participated in any conversations, and I see, Your Honor, that I am out of time on that, so I won't cease my argument. All right. Thank you very much, Mr. Brodnick. Next, we'll hear from Ms. Uliana on behalf of Mr. Mosby. Good morning. I'm Stacey Uliana, and I represent Andre Mosby. The issue before this court today is really twofold. Number one, whether a warrant authorizing the seizure and search of all cell phones, regardless of ownership, is unconstitutionally overbroad, and two, if so, whether the warrant is so lacking in particularity and probable cause that a legal police officer after Riley v. California would not have relied on it. In this case, we had a 169-page His phone number was never mentioned. There were no electronic surveillance of him, but, yes, the warrant authorized the limitless search of his cell phone because it authorized the search and seizure of all cell phones and the electronic data inside of them. As such, this warrant was facially overbroad. It exceeded the probable cause to support it, and it was not as particular as circumstances would have allowed. Ms. Uliana, the search here occurred about eight months after the Supreme Court's decision in Carpenter. Is that correct? I don't know. Eight months before. I apologize. Yeah, I thought it was before, right? And so, I do know that Carpenter was raised, but I did not raise it on appeal because I do believe the good faith would have kind of had with that issue would have applied. Do you want to address the good cause issue with regard to the timing of the motion to suppress as well as the plain error standard? Sure. So, the district court found good cause to go forward. I mean, she did not say the words that the voluminous discovery was good cause, but she did say that because of the voluminous discovery, she was going to go forward on the merits. And so, that implies that to her, that's the reason to go forward. If she were going to say that this was not good cause, she would have said, despite finding no good cause, I'm going to look at the merits. And as I reviewed the cases from the Seventh Circuit, I found no case where a district court had cited to the defendant's reason supporting good cause as the reason to go forward and hear the evidence and the merits of the case and this court finding that the defendant had waived or forfeited that. As for plain error, we did not argue that because I believe we're pretty solid on the good cause issue and that the judge rightly found that there was good cause. And also, if you look through the prior motions, there were a couple of motions to continue. The defense attorney, Andre Mosley's trial attorney, had argued that she had a difficult time finding all of the discoveries. And the court had disposed of that and disagreed. But when she was going to the suppression issue in the good cause as to why it was waived, she argued two things. One, her difficulty in trying to find, you know, what she needed to find and the voluminous discovery. So, the judge disposed of the difficulty issue, but found that the voluminous discovery justified hearing the merits of this case. And the merits are important because in Riley v. California, the court was very clear that this is not a container and that's how the police officers in the search looked at these cell phones. They looked at them as a container that they can search for any type of evidence that the warrant told them they could look for drug activity. Riley v. California disposes of that argument. Can I ask you to address, I hope the government will also address this question, because I understand that the government has described the location for which this warrant was issued as a clubhouse. I'm not sure exactly what's meant by that or what the support for that was, but that seems to be important to the government. So, could you address that issue, Ms. Williams? I think they did call it a clubhouse, but it was a conclusionary statement. Their only evidence they had about this house was that Richard Brandy was seen there a couple days before the warrant was served, and he was seen with his niece and also his father was seen there. There was no evidence that any other members of the conspiracy or targeted individuals were seen there. So, just to say- Was there evidence that other target phones had been there? Not that I saw. I would have to review the 169 pages, but they did not include it in the paragraph discussing why they were searching Metcourt. So, I would believe if they would have found it, they would have put it in their probable cause for this home Metcourt. Thank you. All right. Thank you very much, Ms. Ullianna. And then on the defense side, finally, we'll hear from Mr. Minch on behalf of Mr. Beasley. Good morning, Your Honors. May it please the Court, my name is Theodore Minch, and I'm from Sovich Minch LLP in Indianapolis, Indiana, and I represent the appellant in this case, James A. Beasley. Your Honors, this morning, I wish to focus on primarily a sufficiency argument as to Counts 1 and Count 17, both of which Mr. Beasley was convicted of a trial. And I'll try not to reiterate what my colleagues, Mr. Moudy and Mr. Brodnick, have already pointed out with regard to the bisexual relationship that we believe exists in this case as to Mr. Beasley. But I do want to focus on and highlight a few issues that arose during the trial in this matter. Essentially, Your Honors, the charged conspiracy was alleged that from on or about August 27, 2016 through November 17, 2017, in the Southern District of Indiana, 21 named co-defendants, co-charged individuals had participated in a conspiracy to distribute methamphetamine. And the reason that the dates are important in this case as to Mr. Beasley vis-a-vis the way that the case was ultimately charged and indicted is that Mr. Beasley's, even in reviewing the evidence in a light most favorable to the government, Mr. Beasley's participation or involvement more particularly in this case was for a period of only approximately 11 days as to the purchase of methamphetamine from September, actually eight days from September 3, 2017 to September 11, 2017, and involved the purchase of a grand total of 12 grams of methamphetamine from one individual who wound up being a cooperating co-defendant, in this case, Mr. David Carroll. The case law that we rely upon in our argument here is Seventh Circuit case law referencing several factors that the court can use to assess whether or not there was a buy-sell relationship. And that's what we argue as to Mr. Beasley. Essentially, in the Johnson case, the court listed several factors that can be relied upon to determine whether or not, in fact, there was a buy-sell relationship. And I've enumerated those factors as they compare to Mr. Beasley's involvement here. But essentially, the Johnson court states that sales on credit or consignment, an agreement to look for other customers, payment of commission on sales, an indication that one party advised the other on the conduct of their business, and an agreement to warn of future threats to each other's business stemming from competitors or law enforcement authorities. Essentially, and that's, again, the Johnson case and the Cologne case, likewise, sets forth several factors which the court can use to consider whether or not a conspiracy exists. And that is the use of code names, prolonged cooperation, repeated transactions, purchases in wholesale quantities, a shared understanding that the narcotics purchase would be resold, and a regular standardized method of dealing, evidencing mutual trust. Mr. Manchin, can I ask you to straighten me out on a factual issue? Yes, Your Honor. You tell us that Mr. Carroll never fronted meth for Mr. Beasley. The U.S. tells us that it would be partially fronted. What's happening? What's going on with that? Okay. Thank you, Your Honor. Actually, within my brief, and I can't find the exact site now to the particular testimony that Mr. Carroll gave, but I was trial counsel for Mr. Beasley in this case, and understanding the law and the nature of buy-sell relationships, I asked Mr. Carroll definitively whether he ever fronted methamphetamine to Mr. Beasley, and his answer to that question definitively was no. And in fact, within the transcript, and even in some of the intercepted calls or a couple of the intercepted calls between Mr. Beasley and Mr. Carroll, Mr. Carroll even acknowledges that Mr. Beasley doesn't owe him any money, and that Mr. Beasley had paid in full. Again, I would focus on the fact that there were only three transactions for methamphetamine between Mr. Carroll and Mr. Beasley in this case for, again, a total of 12 grams of methamphetamine. I believe that the government focuses their argument on the fact that even though there were these just three mere transactions, that because Mr. Beasley had, and I think even Judge Magnus Denson had referenced this in our sentencing order, that because Mr. Beasley's transactions had ramped up over that week or that eight-day period, that that was evidence of more than just a buy-sell relationship. But in fact, the fact of the matter is, there's just no evidence whatsoever that Mr. Beasley was, in fact, engaged in anything other than what might be considered a wholesale retailer-type arrangement with Mr. Carroll. So we do disagree with the government that Mr. Carroll was fronting Mr. Beasley, and we believe that that's clear from the transcript, Your Honor, and Mr. Carroll's testimony. Turning to our argument as to Count 17, there was methamphetamine that was located at a home in the Indianapolis area. The government alleged that the home was owned by Mr. Beasley's girlfriend, Ms. Cook. There's simply, as we cited in our brief and as we argued as well at the trial court level, there simply is no evidence that Mr. Beasley had any relationship with this residence. Nothing of his was found at the residence, no IDs, no keys. There's no evidence at all that he had any access or was even an agent at any time. So, Your Honor, I've run out of time. All right. Thank you very much, Mr. Minch, and to all the defense counsel. Everybody's got rebuttal time, and we'll now hear from Mr. Reitz on behalf of the government. May it please the Court, Brian Reitz for the United States. I would like to take the arguments and the chronology that the defendants did. Of course, if the Court prefers to redirect me at any point, I will redirect. So, starting with Mr. Vizcarra-Millan, he has certainly identified an incredibly difficult constitutional issue, but giving due respect to the district court and the difficult decisions faced by the judge, reversal is unwarranted. His argument depends on two points, both of which are wrong. First, he incorrectly says the judge imposed a finality requirement. That is incorrect. The judge referred to Rule 11, which was an attempt to ground her analysis, not as a full importation of Rule 11. And specifically, the judge referred to Rule 11 primarily as a way to hold defendants to their in-court statements. If you look at the one paragraph where the judge talks about that, she mainly cites cases that in-court statements matter. That was not a finality requirement, but it was an attempt to prevent capricious defendants from whipsawing the district court, which that is pertinent in this legal ground that is the choice of counsel. Second point that Mr. Vizcarra-Millan is incorrect about, his argument really rests on discrediting the district court's factual finding that he acted in bad faith. But the district court judge had a firsthand view of Mr. Vizcarra-Millan's conduct, as did the AUSA, and both those firsthand views considered Mr. Vizcarra-Millan were acting in bad faith. His argument on appeal seeks to elevate his secondhand view, self-serving secondhand view over those firsthand views. This court owes deference to the district judge's factual findings, and the bad faith is a factual finding that I think is in the realm that this court reviews for clear error, and Mr. Vizcarra-Millan cannot show that. In fact, I think his argument is so dependent on that that in his reply brief, he seeks to expurgate portions of the record that support the judge's determination of bad faith. But the cases he relies on to do so do not support that. First, Midwest Spence is about supplementing the appellate record. That of course is inapplicable here. Mr. Vizcarra-Millan next cites Howe, but Howe is a little more on point about whether this court should consider trial testimony after a suppression hearing, and the court said that it's a decision on a case-by-case basis. So there's no general rule that things that happen after a ruling by a district judge can't be considered, and here I think it would be quite anomalous not to consider facts that the district judge specifically said buttressed her opinion. So this was something that occurred. It further proves the district judge's point about bad faith, and the district judge commented on that. Can I ask Mr. Reitz to address Mr. Henderson's point about dealing with the issue in May and June without bringing Mr. Vizcarra back into court? Yes, Your Honor. So I think that he's correct that that was an option for the judge to do. I don't think it was a requirement. In Kerr, the court said that when a defendant's reasons for a change of mind are apparent from the record, there's less need to do so, and even if that was a problem, I think it was remedied by what occurred at the sentencing hearing, and Mr. Vizcarra-Millan explained it. He explicitly said that his problem was that he was attempting to use the conflict as a plea bargaining tactic. That was his view and his problem in his view. So I don't think it's reversible to not have had a hearing. I mean, Mr. Vizcarra-Millan had two hearings about this, and then the sentencing hearing, so the judge heard from Mr. Vizcarra-Millan frequently. Okay. Can I ask you, I frankly was a little surprised that in the May-June discussion, the district judge did not rely on a timeliness concern in rejecting this. What to me as a district judge would have looked like as a last-minute attempt to switch last-minute six weeks before an at least six-defendant trial with I don't know how many thousands of intercepts and wiretaps and so on, and the problem that any new counsel would have in preparing. Can I ask you, at that point, how long had defendants been in pretrial custody? Since 2017, I believe. I don't have the exact date. Yeah, it had been quite a long time. And on the timeliness, I think perhaps the truth lies a little in between both parties' briefs. Mr. Vizcarra-Millan is correct that the judge said she was not going to consider the inconvenience to the court or the other parties in moving a trial, but the judge also did consider the untimeliness of the motion as a factor in that it was, I think she called it suspicious or suspect because it likely would cause delay. So perhaps the timeliness is better considered a factor buttressing the court's bad faith finding as opposed to an independent factor, but it wasn't completely excluded from the judge's determination of bad faith. And I think Your Honor's point is correct that in this case, six weeks really wasn't that long. I mean, even Vizcarra-Millan in his briefing says that at one point it looked like a potential five- or six-week trial. So six weeks before a trial of that length that ultimately ended up being a five- to three-week trial, that is not a lot of time to prepare for this type of case. So if the court has no further questions on that issue, we would just stress that the district court's decision was based on its factual finding that Mr. Vizcarra-Millan was acting in bad faith, and this court should give deference to that in a firm. On moving on to Mr. Grundy, I think really the only thing I would say on this is that Mr. Grundy's request came two weeks after a mistrial was declared because he tampered with the jury. So his interest in obtaining the discovery materials was inherently suspect, and the district judge was rightly concerned and rightly sought to limit that. I don't think that Mr. Grundy can show that that was an unfair or inappropriate restriction, and the fact that the judge told Mr. Grundy beforehand is commendable. As Your Honor noted, federal judges are supposed to essentially, I think, talk defendants out if the lease advised them that it's unwise, and the discovery in this particular case with this particular defendant was any restriction was not inappropriate. On Mr. Atwater, probably the only thing I would say is that the evidence showed that he was on the same side as Carroll. He told Carroll that he had customers and he requested the drugs be individually packaged. That shows that there's a mutual understanding of redistribution. So whatever one thinks about the agreement or non-agreement, the single warning about police presence, Mr. Atwater was on the same side as Carroll. That means he was a conspirator. Could you, Mr. Reitz, I gotta tell you, I'm kind of underwhelmed by the packaging request. I would think that we could expect to see that in any long-term distribution relationship, and that doesn't seem as, at least as I understand the law, to be quite enough. But could you address the evidence on fronting to Atwater? Yeah, sure. The testimony is that Carroll fronted drugs to Mr. Atwater nearly half the time. That is, we think, sufficient in itself to infer a conspiratorial agreement. That is, considering the length of time, that's a pretty significant number of fronting. From my understanding, Mr. Atwater doesn't really dispute that, other than noting that the particular transactions discussed at trial weren't fronted. But fronting half the time is an inference, certainly, of a conspiratorial agreement. Moving on to Mr. Neville, Mr. Neville's argument is an attempt to reweigh the evidence and also to refract each discrete piece of evidence into isolation. But in a historical case, the jury's job is to piece together all these facts and come to an ultimate conclusion. The jury did so here, and it was reasonable. I take it as Mr. Neville's argument is mainly attacking the credibility of Mr. Mitchell. But Mr. Mitchell's testimony was important, but not necessarily decisive. Even without Mr. Mitchell's testimony, we have evidence that Neville was a courier. He was stopped between Indianapolis and Arizona transporting drugs. He had discussions with Grundy about the conspiracy, and one drug deal to Joseph Webster, Mr. Grundy appeared, gave him the drugs, and then Mr. Neville sold them to Mr. Webster, which certainly shows a mutual understanding of redistribution, meaning they were on the same side, and that is conspiratorial by definition. Your brief mentions evidence that Neville was storing drugs for other people. Yeah. Could you be more specific about that? Yeah. He stored – I think Mr. Neville is correct. It was at least – and maybe it was only one time, but there was a phone intercept where it was discussed on transcript volume 4 at 291-92. It's just a single reference saying that Bullock's drugs were at Neville's residence. Okay. But that is further indicative of the conspiracy because that shows that Neville and Bullock are on the same side. Thank you. You're welcome. Moving on to Mr. Mosby, and I do want to get to a couple points, including the point that Your Honor mentioned. I'll start by saying that Mr. Mosby's argument is superficially appealing because it deals with one of the two particularity problems well. In fact, I mean, certainly Mr. Mosby's argument would protect privacy. However, it does so in a way that would thwart legitimate law enforcement measures, especially in conspiracy cases. In other words, there's little way for her argument – for his argument to win without doing so. Now, and I think that maybe a good way of showing that is townhome unit, which is the Southern District of Illinois magistrate judge decision that Mr. Mosby cited in his reply brief. So townhome unit gives three ways that officers can identify phones, and I think this actually supports the impracticality of Mr. Mosby's argument. So those three ways are, one, interviewing witnesses on the scene. This court has essentially scoffed at that idea in Bishop saying law enforcement officers would be fools to believe the criminals at the scene, and I think the reasons for that are obvious. So interviewing – a voluntary interview at the scene is simply not a workable solution for identifying phones. Second, townhome unit says that the officers could dial known phone numbers. I suppose that possibly works for the known phones, assuming they're on, but there often will be unknown phones. This case, I think, is a perfect example of that. Drug dealers often change their phones to avoid detections. They have burner phones, so the police are not inherently going to know the phone numbers. This would thwart legitimate law enforcement needs as well. Third, townhome unit says conduct surveillance to workable phones are essentially fungible and unidentifiable. I mean, here there were 11 phones, seven iPhones, three flip phones, and one Galaxy. I don't exactly know how law enforcement is going to say this iPhone that I saw Mr. Grundy hold, it was black, so therefore this is an iPhone. I don't view those as workable. I mean, so the practicality requirement – or the particularity has to consider law enforcement needs, and I don't think there's a workable solution to do so. Two points beyond that. One, I don't think I highlighted this quite well enough in my brief, but if you look at the warrant, which you can find on the record 774-2, paragraph 197 of the these records, these records being evidence, so I think that is something of a limitation that it may – the cell phones that may contain evidence of the crime, so it's not necessarily every single phone. With that, I want to address, Judge Hamilton, your question about the clubhouse. So the warrant said that this address appears to be the clubhouse, so I don't think that affidavit even purports to establish probable cause that it was the clubhouse, just that there was a suspicion that it was a clubhouse. Now, in retrospect, it turns out that it was, a couple reasons. One, whenever the warrant was executed, there were five conspirators there, and then another cooperator said it was called the honeycomb hideout, quote honeycomb hideout, because that is where the conspirators went. Now, that is not to – we cannot impute backwards facts, but the warrant doesn't – a warrant has to establish probable cause overall to search not necessarily probable cause on every single statement made in the warrant, but we had reason to – and the officer said reason to believe it was the clubhouse, so with that view, it was reasonable for them to believe that all the phones in that residence would be – have indicia of the crime. And with that, I want to talk about good faith in a way, what the officers were supposed to do both before and after. So the sine qua non of good faith is deterring police misconduct. First, when they sought the warrant, they got a warrant, which is prima facie evidence that they were acting in good faith. They believed that this was the clubhouse of the conspiracy, therefore their belief that the cell phones in this location were evidence of the crime, I think, was strong. Now, there are other residences that – another family lived there. Certainly, at that residence, maybe there's less reason, but for a clubhouse, all the phones there, I think, are – it was reasonable for the police to believe they could search them. And then if we look at what happened when the warrant was executed, the police arrived at what they believed was a clubhouse. They find 10 people, 11 phones. What are they supposed to do? I'm not entirely sure. Beyond that, of the 11 phones, two were in people's pockets, and the remaining nine were strewn about the residence. So requiring law enforcement to somehow identify those phones and then exclude them and not seize, not search some of them, is simply not workable. One final point on Mr. Mosby. Judge Brennan mentioned good cause. We don't think the district court necessarily made a good cause finding. I think, to be fair, the judge here got closer to a good cause finding than in the other two Fourth Amendment issues raised here. But I think it was an – I think addressing the merits was an alternative grounds finding. But even if the court disagrees on that, we would stress the untimely filing is important for a reason that Mr. Mosby raises in his reply brief. He says that the government has waived or forfeited the independent source or inevitable discovery doctrines. Even accepting that those are potentially waivable because this court, of course, can affirm on any grounds, I think it's important to note that untimeliness. Mr. Mosby filed this motion four days before a lengthy trial. So I don't think he can then use his failure to file a timely motion as an affirmative defense to prevent the government, to fault the government, for not making an argument. Of course the government was distracting with preparing for trial at this point in time. So I don't think, even if the court finds that good cause was found, I don't think that Mr. Mosby can then use his untimely filing as a way to prevent the government from raising a viable argument here. With that, I will turn to Mr. Beasley's argument. I think that the first point is about the fronting. And for this, I'll read from the record. This is the transcript volume three at page 163. The AUSA, this is during David Carroll's testimony, the AUSA asked David Carroll, quote, so under the terms of that deal, would you be partially fronting the meth to James Beasley? Carroll answers, right. That is unequivocal testimony that Carroll partially fronted drugs to Beasley. Was that like the $100 discount? Am I remembering that right? Yes. Of course, it was not a significant amount of fronting. It was $100 on 800. We grant you that. We grant that. We grant Mr. Beasley that. It was not significant, but it was partial fronting. Irrespective of fronting, we know that Carroll and Beasley were on the same side because Carroll knew that Beasley was redistributing the drugs. The problem I have with that, Mr. Reitz, is that that's always going to be true, isn't it? At least in a vast majority of cases where you've got, in essence, an upstream seller to a downstream dealer. Well, this court in Cruz, I mean, I'm not sure perhaps it is in a number of cases, but this court in Cruz said that if there's a mutual understanding of redistribution, then they can't be buyer and sellers because they're not. Is there an implicit understanding in a lot of these cases? I think that's possible, but we have more than that here because Carroll actually encouraged Beasley to keep selling, to sell more, because Beasley selling was going to benefit both of them. I think two more points on Mr. Beasley. Issues that were raised in the reply brief that weren't in the opening. Mr. Beasley in his reply brief, I mean, of course, arguments raised in the reply brief are way, but I do want to address them anyway. Mr. Beasley, for the first time in his reply brief, claims there was not evidence of his intent to distribute for the drugs found at Susan Cox residence. So first of all, everything else in the record shows that Beasley was redistributing drugs. Second, the drug seized there were 83.3 grams of meth, while a user amount is 0.2 to 1 gram. So there was certainly an inference that that amount of drugs was for redistribution, not user. Next, in his reply brief, Mr. Beasley attacks Susan Cox's testimony. I think it's important to note on that. So there are two pieces to that. Cox's statement to law enforcement, Mr. Beasley objected to that, that it was hearsay, and the district court gave a limiting instruction that it could, that was not offered for the truth of the matter. That's at transcript volume four at 160. So the jury, which is presumed to follow those instructions, did not use Cox's statement to the police as substantive evidence, nor did the government. The statement in question was that he had been there the night before, correct? Correct. Okay. So what else is there to establish the kind of relationship? Let's assume that the jury observed that limiting instruction. What else is there to substitute for the relationship? So we have testimony that, I mean, we have a wiretaps between Lizzie, Lizzie B and Carol discussing how the drug, how Mr. Beasley's drugs were found in her house the night before and how it was found in his shoe. So I don't think the important factor is whether they were boyfriend, girlfriend, it's whether it was his drugs and whether they were found, those drugs were found in her house. And the conversations between those two indicate that it was, plus we have the circumstances that he bought drugs outside of the hang time and the drugs were found next to a hang time bag. So these are inferences the jury can draw. I'm trying to, I'm trying to, what I'm struggling with in that Mr. Wrights is if you compare, for example, the inferences that we describe as speculative in, let's say, civil employment discrimination cases, we would often wind up saying that, affirming summary judgments for defendants saying that the plaintiffs just haven't linked up these little bits and pieces of circumstantial evidence. Here you've got a standard of proof beyond a reasonable doubt and bits and pieces, particularly with the limiting instruction on the statement by Koch. You know, the Jackson against Virginia opinion specifically refers to those kinds of civil comparators in this. And I'm struggling with this one because this seems so fragmentary. We don't think it's fragmentary. So maybe stepping back there, we know that Mr. Beasley had just drugs next to a store near where Mr. Beasley had bought the drugs. The drugs show up there. After that, other conspirators talk about how Mr. Beasley's drugs were just found in her house and in his shoe. I don't, I'm not sure what other reasonable inference to draw. I think it's fair to say that usually the government comes with overwhelming evidence and mostly in this case includes overwhelming evidence where this particular count requires the jury to make inferences. But that is the sufficient standard. Juries are allowed to make inferences. And to reverse, the court has defined that it was irrational for the jury to make that inference. And I don't think that Mr. Beasley has shown that. Thank you. All right. With that, if there are no further questions, we would ask the court to affirm in all respects. Thank you. Yes, there are no other questions. All right. Thank you very much, Mr. Reitz. We'll begin defense rebuttals beginning with Mr. Henderson. Thank you, Your Honor. I want to speak generally because I only have two minutes. I think the main question here is whether the court can have a complimentary integrity report. Mr. Henderson, I'm sorry. Could you back up for a second? We were having a little bit of trouble with the audio there. Oh, sure. I'm sorry about that. Can you hear me now? Yes. Thank you. Reset it for two minutes, please. The point of Holloway v. Arkansas that requires automatic reversal when this right is denied is that the evil is in what we don't know. It's in what the advocate finds himself compelled to refrain from doing. And we see that in this case. I think that it would be credulous to suggest that Mr. Vizcarra-Millan was the main source of the problems here when the evidence overwhelmingly shows that his lawyer was acting unethically and was not being candid with the court. Of course, the lawyer had been sanctioned. But we get a snippet of that where before trial, the lawyer protests to high heaven that he cannot represent Mr. Vizcarra-Millan. And at sentencing, Mr. Vizcarra-Millan says, look, my lawyer was telling me as I was trying to negotiate a plea that he couldn't represent me at trial, that this was an enormous conflict. He just couldn't do it. And the district court said, I don't believe you because you haven't substantiated your statements. Because when it asked Mr. Tennyson, did you make those statements? He said, I don't remember. That does not give me confidence in these proceedings. And for all of the reasons that we've given in our brief, I think there's overwhelming evidence here that Mr. Tennyson took Mr. Vizcarra-Millan down this path. And when Mr. Vizcarra-Millan objected and raised his hand to the court and said, I want independent counsel, the court held him to an incorrect legal standard that said, no, you said before that you didn't. And so I'm going to hold to that. Excuse me, but can I ask you to address the, as conflicts go, there's an argument that this one just isn't all that serious. That because his other clients didn't have any relationships with Vizcarra, didn't know him, never met him. The only thing they could have said against Vizcarra was, yeah, Arizona was the source. But as far as I understand, that was never disputed by anybody, including Vizcarra. Do you agree, disagree? How should we weigh that? I disagree that this was not a serious or actual conflict. I think this is a quintessential conflict of interest when you represent one person and you have to cross-examine another client. The reason for automatic reversal in those sorts of actual conflict cases is because we have to make decisions before trial. And while it may appear that, well, maybe we can handle this some way, maybe there's not actually going to be a lot of testimony. It only takes one document. It takes one bit of testimony, one surprise at trial, and everything goes out the window. The district court considered this to be an actual conflict. I think it was right to do so. It's the quintessential actual conflict. So I don't think that that would be a reason to suggest that the Sixth Amendment right can be a bridge in this case. Thank you. Mr. Carlson? In light of the government's argument, I would yield my time for rebuttal. All right. Thank you. Mr. Mowdy? Your Honor, I would simply like to mention that in this court in U.S. v. Brown talked about the considering the totality of the circumstances when looking at conspiracies and taking a holistic approach. And I would argue that many of the factors that the government is pointing out are explainable in the paradigm of a buyer-seller relationship, certainly from a wholesaler to a retailer, a contractor going to Home Depot as opposed to Lowe's or Menards. I think that is maybe a more commonplace example. But if we pinpoint down to this question of fronting drugs, I believe that it's important that the court recognizes that Mr. Carroll knew Mr. Atwater for nearly two years and testified that their relationship was or at least began as a marijuana relationship. That was prior to any of the association with Grundy or anyone else. And so that's why we believe it's important that when Carroll testifies that less than half of the times dealing with Atwater, drugs were fronted, there needs to be more specificity. And that if that is the only factor, say we can see just for the sake of argument, that's the only factor that deals with being a co-conspirator, we don't feel it rises to the level of all of the circumstances. Thank you. Thank you very much, Mr. Mowdy. Mr. Brodnick. Thank you, Your Honor, very briefly. The government has brought up a couple of other facts with regard to attempting to rope Mr. Neville into this conspiracy and indicates that we're trying to cherry pick particular facts. And that's not what we're trying to do, but we certainly have to address those facts. We think we've done that in our briefs. The two things that he has brought up was that he talks about Mr. Grundy showing up on one of these transactions to provide drugs to Mr. Neville, who then provided them to the confidential human source. And that was in Mr. Neville's apartment. In my opinion, Your Honor, that is evidence of a buyer-seller relationship, not necessarily of a conspiracy. It's equally plausible it's a buyer-seller. What possible distinction can there be with that transaction had Mr. Neville gone downstairs and met Mr. Grundy to pick up the drugs and then brought them back upstairs to sell to the confidential human source? The fact that it occurred within the apartment doesn't bring that into the realm of a conspiracy. With regard to the storing of drugs, the court is correct that there was one conversation which did not involve Mr. Neville. It was between two other co-conspirators, and they had indicated that one of them had drugs stored at Mr. Neville's house. Now, the agreement, if you will, that the government has conceded is the agreement to redistribute drugs. Well, the evidence on that call was that those drugs were Mr. Bullock's. They were not Mr. Neville's, but only Mr. Bullock's. And while that evidence that they were stored at Mr. Neville's house may make him an aider and a better, it does not show that he agreed with Mr. Bullock to redistribute those drugs. Thank you. Thank you very much, Mr. Brodnick. Ms. Juliana. Thank you. I would like to address the government's argument that this court can't protect a person's privacy in their cell phone because it is too difficult to figure out whose cell phone it is. I respectfully disagree. I think this court can allow legitimate investigations while also protecting privacy. And the way to do that is to restrict the warrant to the cell phones for which they have probable cause. If the government would have said that they are searching for cell phones, it would have created a duty on the government to have determined ownership. As the government said, there were multiple people in this house, multiple cell phones. If you know you can only search some of them, then you have some duty. And here they had the means to do that, right? They had a receipt with Andre Mosby's cell phone number and his make and model and the IEMI number on it. And they could have called the phone and seen if it rang and if it was Andre Mosby's. Or once they got the forensic done, they didn't have to look through every message. They could have looked through one message to see what outgoing phone number it is and determined it was Andre Mosby's. Second, it would give a duty to stop when the government sees that it's Andre Mosby's phone. It's just hard to believe that they had to go through every single picture, every single message before they realized it was Andre Mosby's. At some point, had this been limited in scope, they would have had to stop and got a warrant for Andre Mosby if they had the means to do so. I would also like to address the whole four corners of the affidavit. You know, the government brings up this idea that there was other evidence it was a clubhouse, also that drug dealers change folks. All of that may be true, but it wasn't in the warrant. It wasn't a warrant application. It was 169 pages. And that paragraph 197 is pretty boilerplate. And they don't put that in there. So we can't consider it today. Thank you. All right. Thank you very much, Ms. Juliana. And then Mr. Mitch. Thank you, Your Honor. And I'll be brief, obviously. I just wanted to go back to the government's argument and also a statement that I'd made earlier. And the beauty of having so many great colleagues arguing this case on behalf of their clients is that it did give me a chance to go back and look at the transcripts, Your Honor, to address specifically your question with regard to the to the nature of the transactions between Mr. Beasley and Mr. Carroll. And I see I could locate it certainly as trial counsel. It was my recollection that I did ask Mr. Carroll directly whether he had in front of Mr. Beasley any methamphetamine. And I could not find that in the record. So I just want to make sure Your Honor was aware of that. I'm not saying it doesn't exist, but I did get a chance to look at that. And I did not find it to be quite candid. But there was these communications. I do understand that the government's counsel asked Mr. Carroll whether he had fronted Mr. Beasley methamphetamine. And Mr. Beasley's response was yes. I would note that Mr. Carroll is a government's witness. But I would also note that the best evidence in this case, I believe, is to whether Mr. Beasley had actually been fronted methamphetamine by Mr. Carroll with the transcripts of the calls between Mr. Beasley and Mr. Carroll themselves, wherein, as I think Your Honor sort of alluded to, was whether this was a negotiation or a negotiated price or whether this was, in fact, fronting as the term goes in the case law that we have as the buy-sell relationships. And again, page 26 in my opening brief, I cite to those that particular phone call, the particular transaction in question. And Mr. Carroll definitively states that Mr. Beasley owes him no money, that the negotiated price was, I believe, $700. And Mr. Beasley acknowledged as well that he owed Mr. Carroll no money. So despite Mr. Carroll's testimony after the fact as a one transaction, there may have been a $100 front, it's Mr. Beasley's position that that $100 front was actually a negotiated price. I might add, Your Honor, as to count 17 and the court's questions with regard to the evidence that the government had that the methamphetamine located in Ms. Cook's residence was, in fact, Mr. Beasley's, I would note that, as Mr. Wright had said, that the testimony referenced Ms. Cook's statements did receive a limiting instruction. But I would find it also ironic that this government appears to rely upon the statements made by Mr. Lisenby that were admitted as a co-conspirator statement. If Mr. Beasley were to be found by this court to be not guilty of his judgment of conviction vacated as to count one, that would no longer make him a co-conspirator for the purpose of admitting the statements that Mr. Lisenby made as to Mr. Beasley's involvement and relationship with Ms. Cook. I see that I'm out of time, and we appreciate your time this morning, Your Honors. Thanks to all counsel on both sides. Those of you who took CJA appointments, we all know that these are very challenging cases for everyone involved, and compliments to everyone for your efforts in this case. The cases are taken under advisement. We'll move.